Ira GERE, guardian ad litem of Rose Gere, et al.

v.

UNITED STATES of America.

Caroline GERE

v.

UNITED STATES of America.

Civ. Nos. 75–3022, 75–3018.

United States District Court, D. South Dakota.

Feb. 3, 1977.

848

Wally Eklund, Gregory, S. D., Mark V. Meierhenry, Vermillion, S. D., for plaintiffs.

William F. Clayton, U. S. Atty., Sioux Falls, S. D., for defendant.

## MEMORANDUM OPINION

BOGUE, District Judge.

Plaintiffs in the above-entitled Federal Tort Claims Act matter were injured in an automobile accident while they were riding in a vehicle which was being used to transport Rose Gere from her home to a Public Health Service Clinic. The vehicle was owned by one Ellen Moran, who was at that time a Community Health Representative employed pursuant to a contract between the Rosebud Sioux Tribe and the Department of Health, Education and Welfare. The accident occurred on June 11, 1974, and references herein to a "contract" will be to the contract between the Tribe and HEW which was in effect at that time.

The trial of this matter was bifurcated, and the only issue now before the Court is whether Ellen Moran, whose alleged negligence allegedly caused Plaintiff's injuries, was an "employee of the [federal] government" rather than an employee of a "contractor with the United States" within the meaning of the Federal Tort Claims Act, 28 U.S.C. § 2671 at the time in question. An answer in the affirmative is, of course, a prerequisite to recovery in this action.

The contract in question was entered into July 5, 1973, and was signed by the President of the Rosebud Sioux Tribe and by a "contracting officer" on behalf of the United States. One of the primary purposes of the contract was to "provide an effective transportation system to health resources." Art. I § A.1.(c). Under the contract, the Rosebud Sioux Tribe was to designate a "Community Health Representative" for each community on the Rosebud Indian Reservation. Ellen Moran was the Community Health Representative, hereinafter C.H.R., for the Swift Bear Community, of which Plaintiffs' home was a part. C.H.R.'s had several responsibilities, among which were to: "make home visits and refer to appropriate health workers, people found to be suffering from illness; [and] transport people who do not have cars or other readily available transportation to clinics and hospitals." Art. I § A.2.(j), (k). The express terms of the contract listed forty other specific duties which the C.H.R.'s were to perform. On the day in question, Ellen Moran was acting as a C.H.R. and was transporting Rose Gere to a Public Health Clinic for treatment of a shoulder injury.

Subject to the availability of funds, the federal government was to provide training to the C.H.R.'s. Art. I § B. The contract suggested that some of the training could be accomplished at the Indian Health Service Training Center in Tucson, Arizona. Id. Although no funds were ever specifically appropriated by the federal government for C.H.R. training, several of the Rosebud C.H.R.'s were trained pursuant to arrangements made by federal government personnel.

Under the contract, the Rosebud Sioux Tribe was required to submit monthly

progress reports which were to include "a record of daily activities of the Community Health Representative, including such items as number of visits made, environmental condition corrected, individuals transported, educational conferences held and number of attendees, etc." Art. I § A.4. The contracting officer for the federal government was to perform "review and approval of the work required by the contract." Art. III. The federal government had the right "to inspect, or otherwise evaluate the work performed or being performed" under the contract, § 19, *General Provisions.* The federal contracting officer selected a representative, who was to be "responsible for the administration of the technical aspects of the contract." Art. IV.

Although the parties to the contract agreed upon a fixed price, it seems clear that the installment payments of the fixed price were conditioned upon the federal government's evaluation of the performance under the contract. Article V of the contract specified that each monthly installment represented the "agreed upon fixed-price for satisfactory performance of work during the respective month." Under the method of payment, the federal contracting officer was "to determine contract compliance prior to forwarding to the Paying Office shown on the face page of this contract for payment." Art. VIII.

The government asserts that this contract was negotiated pursuant to 42 U.S.C. § 2002, which reads in relevant part as follows:

> Whenever the health needs of the Indians can be better met thereby, the Secretary of Health, Education, and Welfare is authorized in his discretion to enter into contracts with any State, Territory, or political subdivision thereof, or any private nonprofit corporation, agency or institution providing for the transfer by the United States Public Health Service of Indian hospitals or health facilities, including initial operating equipment and supplies.

However, the contract in question does not appear to be one of the sort envisioned by 42 U.S.C. § 2002, for two distinct reasons: 1) the contract was not entered into with a State, Territory or political subdivision thereof or a private nonprofit corporation, agency or institution, but instead was entered into with the Rosebud Sioux Tribal government; and 2) the contract does not "transfer . . . Indian hospitals or health facilities" but is limited to transportation to, and communication and education about, existing health facilities on the Rosebud Indian Reservation which, at all times relevant to this action, were operated by federal personnel.

This contract appears to be a hybrid type of creature, not specifically envisioned in any of the provisions of 42 U.S.C. §§ 2001–2005. It appears to be a method by which the Department of Health, Education and Welfare chose to discharge the responsibilities it has assumed for itself. 42 C.F.R. § 36.11 reads as follows:

> Within the limits of available funds, facilities, and personnel, *the Public Health Service will make available, within the area served by the local facility, hospital and medical and dental care, including outpatient services* and services of mobile clinics and public health nurses, and preventive care including immunizations and health examinations of special groups, such as school children. (Emphasis added.)

*See also* 42 C.F.R. § 36.1(a). In short, the contract in question did not remove the operation of the clinics and hospital on the Rosebud Indian Reservation from federal control. This of course does not necessarily mean that the federal government could not contract away control of the transportation of Indian beneficiaries to these clinics and the hospital. *See Logue v. United States,* 412 U.S. 521, 528 n. 7, 93 S.Ct. 2215, 2220, 37 L.Ed.2d 121 (1973). *Cf.* 42 C.F.R. § 36.21. The question in this case concerns only the role of the Rosebud C.H.R.'s *vis-a-vis* the federal government, rather than the character of the entire health program at Rosebud. The primary role of the C.H.R.'s was to make this program available to Indian beneficiaries. Thus the factual issue

now to be resolved is whether, in carrying out that role, Ellen Moran was subject to federal control in the detailed physical performance of her duties as a C.H.R. *Logue v. United States*, 412 U.S. 521, 527–528, 93 S.Ct. 2215, 2219 (1973); *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976).

The Plaintiff in *Logue, supra*, claimed negligence in the supervision and observation of a federal prisoner who committed suicide while being housed in a county jail pursuant to a contract made under the provisions of 18 U.S.C. § 4002. Under the contract, federal officers were authorized to inspect the county jail to determine the conditions under which federal prisoners were housed. Under 18 U.S.C. § 4002, the rates paid for such contracts were to be high enough to induce county jails to provide good care for federal prisoners. The contract in *Logue* required that the county adhere to Federal Bureau of Prisons rules and regulations governing incarceration. *Logue*, 412 U.S. at 529–530, 93 S.Ct. at 2220. These rules and regulations included fairly detailed standards for discipline, visitation rights, mail, medical services and employment. *Id.* The Supreme Court held that since these admittedly extensive contract specifications and requirements, even when considered with federal inspection rights, did not amount to federal supervision of the physical performance of the contractor, the county jail workers could not be considered employees of the government within the meaning of 28 U.S.C. § 2671. *Logue*, 412 U.S. at 531–532, 93 S.Ct. at 2221. In so holding, the Court rejected an argument that contractors and their employees should be considered federal employees simply because they are performing duties that, in the absence of a contract, would be performed by federal personnel.

More recently, in the case of *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), the Court considered and rejected a contention that an employee of a local Community Action Agency organized and funded under the Economic Opportunity Act of 1964, 42 U.S.C. § 2781 *et seq.* was a federal employ-

ee under 28 U.S.C. § 2671. The plaintiffs in *Orleans* were injured while returning from a children's recreational outing which had been sponsored by an activity of the Warren-Trumbull Council, an OEO (Office of Economic Opportunity) Community Action Agency. Transportation to and from the outing had been arranged by the Warren-Trumbull Council. The Supreme Court left undisturbed the District Court's findings of fact, which can be summarized as follows: The Warren-Trumbull Council was funded entirely by the federal Office of Economic Opportunity and was created for the purpose of implementing the objectives of the Economic Opportunity Act of 1964; the Warren-Trumbull Council conducted only federally funded and federally formulated programs and was closely supervised by OEO; and in one instance federal funding was discontinued pending a reorganization of the Warren-Trumbull Council which was apparently required by federal authorities. In holding that these facts did not amount to the requisite supervision of the detailed physical performance of the Warren-Trumbull Council, the Court noted:

> . . . [B]y contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs—or of state governmental bodies—into federal governmental acts. 425 U.S. at 816, 96 S.Ct. at 1977.

In *Orleans*, the Supreme Court expressly approved the result reached by the Eighth Circuit Court of Appeals in the case of *Vincent v. United States*, 513 F.2d 1296 (8th Cir. 1975). *Vincent* held that a driver employed part-time by an OEO Community Action Agency to transport children to and from a Head Start program was not a federal employee within the meaning of 28 U.S.C. § 2671. Although the driver in *Vincent* used her own automobile, she was paid with money derived largely from federal grants. Again, however, federal supervision of her day-to-day activities was lacking, and it was held that the driver in

*Vincent* was an employee of a "contractor with the United States." 28 U.S.C. § 2671.

The principles established in the case law discussed above must of course be applied to the facts of this case. The nature of the contract between the Rosebud Sioux Tribe and the Department of Health, Education and Welfare was discussed earlier in this opinion. It now remains to discuss the actual practice under the contract as it was demonstrated at the trial of this issue.

C.H.R.'s were hired by the Rosebud Sioux Tribe. *Tr.* 31, 39, 58, 87. The initial screening and recommending of applicants for C.H.R. positions was done by a Tribal official with the title "C.H.R. Director". *Tr.* 31, 39. C.H.R.'s were paid by the Rosebud Sioux Tribe, which in turn received its funding for this project through the monthly installment-voucher process described above at page 849. *Tr.* 26. C.H.R.'s used their own vehicles, and sixty to seventy percent of their time was spent in transporting people to and from Indian Health Service clinics and the hospital. *Tr.* 39.

The duties of the C.H.R.'s may be characterized as falling into two categories: field work such as transportation of patients, and work in the Indian Health Service hospital and clinics. During those times when the C.H.R.'s worked in the hospital and clinics they were subject to at least *de facto* supervision by Indian Health Service physicians and nurses. *Tr.* 28.

On the other hand, day-to-day supervision of the field duties of C.H.R.'s was, generally speaking, a Tribal function performed largely by the Tribal C.H.R. Director. *Tr.* 24, 28, 31, 37, 42, 83. In the specific area of the transportation of those in need of medical attention to Indian Health Service clinics, the only federal involvement which approaches supervision is the review and approval, and power to make adjustments in the monthly installments, contemplated by Article III of the contract and discussed above at page four. *Tr.* 52–54, 70. On occasion the Tribal C.H.R. Director met with Public Health Service officials. *Tr.* 30. At these meetings the Public Health Service officials would request certain services of the Tribal C.H.R. Director, who would make efforts to carry out these requests. *Tr.* 30.

Probably the most significant non-financial federal involvement in the performance of the C.H.R. contract is through the Article IV federal contracting officer representative, the Service Unit Director. The role of the Service Unit Director, and in fact the non-financial role of the federal government, was summarized as follows in the testimony of Mr. Merlin L. Stein, Indian Health Service contracting officer:

> The Service Unit Director is the contracting officer representative, a man on-the-scene, so to say, to see that the objective of the contract is being carried out.
>
> As such, he is in the field; he does observe the C.H.R.'s in the hospital, I will say, because he is not out in the outlying areas, but he is located within the hospital, and as such he could observe whether the C.H.R.'s are there or not.
>
> I suppose that there is feedback from the Public Health nurses, Public Health doctors to service out in the clinic as to the work of the C.H.R.'s that is done, and if properly the work of the contract was not being fulfilled, he would get in touch with the C.H.R. coordinator, the Tribal C.H.R. coordinator, to straighten out any differences that might be coming up within the contract.

As disclosed by the above-quoted testimony, it cannot be said that Ellen Moran as a C.H.R. was subject to federal supervision in field duties such as the one she was performing when Plaintiffs in this case were injured because of her alleged negligence. While federal officials were empowered to make adjustments in the contract payments and discuss C.H.R. performance with Tribal officials, those federal officials simply were not authorized to supervise C.H.R. Ellen Moran. Accordingly, the Plaintiffs have failed to establish that Ellen Moran was a federal employee within the meaning of 28 U.S.C. § 2671, and are not entitled to recovery under the Federal Tort Claims Act. Therefore, the complaints in these two consolidated cases must be dismissed.

The foregoing shall constitute this Court's findings of fact and conclusions of law.